C. M. NIQUETTE, *Appellee*, V. R. B. GREEN *et al.*, *Appellants*.

No. 16,296.

SYLLABUS BY THE COURT.

1. FINDINGS OF FACT—*Evidence*. The findings of fact in this case are sustained by sufficient competent evidence.

2. TENDER — *Action for Specific Performance — Repudiation by Vendor*. Tender to a vendor is not a condition precedent to the maintenance of an action for specific performance against him when he has put himself in default by repudiating the obligation of the contract of sale.

3. WILLS—*Power of Executor to Sell and Convey Land*. The will involved in this case granted power to the executor to sell and convey the real estate in controversy.

4. FOREIGN EXECUTOR—*Contract to Convey Land—Recording of Will*. A foreign executor with testamentary power to sell and convey land in this state may make a valid contract to convey before the will has been admitted to record in this state. All that section 2953 of the General Statutes of 1901, which

governs the matter, requires is that the will shall be of record at the time of conveyance.

5. ——— *Testamentary Power to Convey—Proof.* In an action for specific performance against a foreign executor it is not necessary that testamentary power to convey be established by a record of the will in this state; and if the executor plead the will to show that it contains no grant of power to convey he can not dispute its existence, authenticity or terms.

6. ——— *Conveyance of Land—Authority—Probate Court.* The statute cited in paragraph 4 authorizes a foreign executor, acting under testamentary power, to convey land in this state without the intervention of the probate court, except to record the will, when no administration upon the estate of the testator has been granted in this state.

7. SPECIFIC PERFORMANCE—*Increase in Value of Land—Minors.* A foreign executor acting under testamentary power has no standing in equity to resist specific performance of a fair and just contract to convey merely because the land has risen in value since the contract was made; and a decree will not be denied when the rise in value occurred while the vendor was wrongfully in default, although he takes a portion of the proceeds of the sale in trust for minor children.

Appeal from Finney district court; WILLIAM H. THOMPSON, judge. Opinion filed January 8, 1910. Affirmed.

*Albert Hoskinson, R. W. Hoskinson, W. R. Hopkins,* and *R. J. Hopkins,* for the appellants; *Baird & Richardson,* of counsel.

*F. J. Knight, O. H. Foster, Fred J. Evans,* and *Fred S. Dunn,* for the appellee.

The opinion of the court was delivered by

BURCH, J.: C. M. Niquette brought an action for the specific performance of a contract to convey real estate against R. B. Green, J. A. Murray, and G. V. Murray, as executor of the will of Granville Murray, deceased. The plaintiff deals in real estate on his own account and as agent for others, and with his son forms the real-estate firm of C. M. Niquette & Son, of Garden City, Kan. The defendants live in Kentucky—Green at

Niquette v. Green.

Louisville, J. A. Murray at Glasgow, and G. V. Murray, executor, at Campbellsville. The land lies in Finney county, near Garden City, and was formerly owned by Green, J. A. Murray and Granville Murray, each having an undivided one-third interest. Granville Murray died leaving a will, of which G. V. Murray is the executor.

The court made findings of fact and conclusions of law, which follow:

### "FINDINGS OF. FACT.

"(1) The plaintiff and defendant R. B. Green, by means of various letters and telegrams which are attached to and made a part of the plaintiff's petition, entered into a contract by which the plaintiff agreed to purchase and defendants agreed to sell section 11, township 23, range 34, Finney county, Kansas, for the sum of $4400.

"(2) Defendant R. B. Green was instructed and authorized to enter into and carry out the said contract on the part of J. A. Murray and G. V. Murray, as executor of the estate of Granville M. Murray, deceased; and they also afterward fully ratified the acts of the said R. B. Green by the execution of a deed conveying the said property to the said C. M. Niquette, and by returning the same to the said R. B. Green for transmission to the Garden City National Bank, at Garden City, Kan., to deliver to the said C. M. Niquette upon the payment of $4400 cash.

"(3) Under the express terms of the will 'of Granville Murray, deceased, G. V. Murray, as executor, had full power and authority to sell and convey the land in controversy, as shown by the following provision in the will:

" 'My real estate consisting of two (2) tracts of land in Kansas, I desire held by my executor until such a time as he deems prudent to sell so as to avoid forced sale, and in order to realize as much as possible out of said real estate, provided the time shall not exceed ten (10) years after my death. That the taxes on said real estate be paid by my executor yearly until sold, he to be reimbursed from the proceeds of said real estate with interest at six per cent per annum money expended for said taxes, the net amount to be

equally divided among my five children hereinbefore mentioned.'

"(4) Pursuant to said contract, a warranty deed was prepared by said C. M. Niquette at Garden City, Kan., and sent to R. B. Green at Louisville, Ky., with instructions to have the same properly executed and acknowledged by the several owners of the land and to return the same to the Garden City National Bank, at Garden City, Kan., with abstract of title, and to instruct the bank to deliver to the said C. M. Niquette upon the payment of $4400. C. M. Niquette also called attention in his said letter to the fact that he had made the consideration in the deed 'even $4500.' It was clearly understood, however, by all the parties interested that the owners of the land were to receive for said land the sum of $4400. C. M. Niquette also requested in said letter that the bank be instructed to give him fifteen days to get the title examined and put up the money.

"(5) On the 29th day of August, 1905, R. B. Green sent the abstract of title to the land from Louisville, Ky., to C. M. Niquette, at Garden City, Kan., stating in his letter that he did so in advance, as it would require several days to get the signatures of the interested parties on account of their living in different parts of the state of Kentucky, and that he would forward the deed to the Garden City National Bank as requested and give Niquette until September 15 to make his arrangements.

"(6) The deed was duly executed and acknowledged by R. B. Green and Annie E. Green, his wife, in Jefferson county, Kentucky, on the 30th day of August, 1905, and then sent by the said Green to G. V. Murray at Taylor county, Kentucky, and the same was duly signed and acknowledged by the said G. V. Murray (or Granville Murray), as executor of the estate of Granville Murray, deceased, on the 31st day of August, 1905; and the same was then sent by G. V. Murray to J. A. Murray at Barren county, Kentucky, and was duly signed and acknowledged by the said J. A. Murray and Eugenia Murray, his wife, on the 4th day of September, 1905, and then sent by him to the said R. B. Green to be transmitted to the Garden City National Bank, at Garden City, Kan., and delivered to the said C. M. Niquette, the grantee named in the deed, upon the pay-

ment of $4400 cash, which was fully understood by all of said parties.

"(7) The deed was duly transmitted by the said R. B. Green to the Garden City National Bank on the 6th day of September, 1905, together with a certified copy of the will of Granville Murray, deceased, which was furnished by the said G. V. Murray, as executor of the estate of Granville Murray, deceased, with instructions that the same be delivered to C. M. Niquette on the payment of $4400, giving him until September 15 to examine the title. At the same time R. B. Green also wrote C. M. Niquette telling him of the forwarding of the deed to the bank, together with the certified copy of the will of Granville Murray, deceased, and informing him that the bank had instructions to deliver the deed to him on the payment of $4400, and giving him until September 15 to examine the title and pay the money.

"(8) As soon as C. M. Niquette received this letter, and on the 9th day of September, 1905, he drew a check on the First National Bank of Garden City, Kansas, payable to the order of the Garden City National Bank, for the sum of $4400, which was duly presented to the First National Bank of Garden City, Kansas, by the Garden City National Bank and paid to it on the same day.

"(9) On the 9th day of September, 1905, W. O. Horr, cashier of the Garden City National Bank, wrote to said R. B. Green at Louisville, Ky., acknowledging receipt of the said deed and copy of the will, and stating that Mr. Niquette's attorney had examined the abstract of title, and the deed, and had made a complete report or opinion, which Mr. Niquette would forward under separate cover; and further advising him that C. M. Niquette had deposited with the Garden City National Bank the sum of $4400 to cover payment for the land as soon as the owners could make the title satisfactory and conform to the laws of Kansas.

"(10) Pursuant to the recommendations of the attorney for said C. M. Niquette, and to carry out the contract theretofore made for the transfer of said land, and to furnish good title thereto, the said G. V. Murray executed an affidavit on the 15th day of September, 1905, at Taylor county, Kentucky, to aid in perfecting the title, which is in evidence in this case as 'Exhibit 11.'

"(11) The deed sent to the Garden City National Bank was returned by C. M. Niquette, together with his attorney's opinion and instructions, to the said R. B. Green at Louisville, Ky., on the 9th day of September, 1905, and in order that a new deed might be executed in accordance with the recommendations of his attorney, which recommendations are in evidence as 'Exhibit 10.'

"(12) A new deed was then executed by the said R. B. Green and forwarded on the 8th day of November, 1905, together with the old deed and the attorney's instructions, to the said J. A. Murray at Glasgow, Barren county, Kentucky, and afterward sent by J. A. Murray to G. V. Murray at Campbellsville, Taylor county, Kentucky, and then returned by G. V. Murray to J. A. Murray without execution by either of said Murrays, and then said deeds were turned over to the defendants' attorneys by the said J. A. Murray.

"(13) Neither the old deed nor the new deed was ever returned to the Garden City National Bank or delivered to the said C. M. Niquette.

"(14) After September 9, 1905, the plaintiff, C. M. Niquette, heard nothing further from the owners of the land until he telegraphed R. B. Green, on November 10, 1905, at Louisville, Ky., as follows: 'When can we have deed to section eleven? Wire.' To which said R. B. Green replied by telegram as follows: 'Ten days if others act promptly.'

"(15) On or about the 15th day of November, 1905, J. A. Murray and G. V. Murray wrote R. B. Green declining to make a deed, and R. B. Green then wrote C. M. Niquette on the 15th day of November, 1905, telling him of this fact, and stating that they gave as a reason that Mr. Niquette had delayed the matter for an unreasonable length of time.

"(15½) The plaintiff was in no way responsible for the delay in closing up and completing the contract, but such delay was caused wholly by the defendants in failing and refusing to carry out the terms of the contract on their part.

"(16) The land of the defendants' in controversy was never listed for sale with the plaintiff or with the firm of C. M. Niquette & Son as real-estate agents, and they were never employed by the defendants to sell or negotiate sales of said land as their agents, and the relation of principal and agent never existed between the

Niquette v. Green.

plaintiff and the defendants at any time during the negotiations.

"(17) No misrepresentations were made by the plaintiff to the defendants concerning the land in controversy.

"(18) The fair and reasonable value of the land in controversy at the time of the execution of the contract between the plaintiff and the defendants was the sum of $4400.

"(19) No tender was ever made to the defendants of the purchase price for the said land prior to the commencement of this action, and none was necessary, for the reason that the plaintiff paid to the Garden City National Bank, the place agreed upon between the plaintiff and the defendants, the sum of $4400, as full consideration for said land, which the defendants could have received at any time upon complying with their part of the contract. From the acts of the defendants themselves by refusing to perform the contract on their part, and to accept the purchase price or to execute a new deed or conveyance or to deliver the deed originally executed, a tender before suit would have been entirely useless and a vain and idle ceremony. The plaintiff has also made his said offer good by tendering the $4400 into court upon the trial.

"(20) The plaintiff has complied with all of the terms of the contract on his part to be performed.

"ADDITIONAL FINDINGS OF FACT.

"(21) The defendants and each of them were at all times pending the negotiations relative to the sale of the land in controversy residents of the state of Kentucky, and they were not at any time during said negotiations within Finney county, Kansas.

"(22) That all the letters and telegrams attached to the pleadings in this case were written by the parties 'whose names appear signed thereto and on or about the dates that appear on their face.

"(23) The check for $4400 drawn on September 9, 1905, on the First National Bank of Garden City, Kansas, in favor of the Garden City National Bank, after being cashed by the Garden City National Bank, was without the knowledge or authority of the plaintiff, C. M. Niquette, placed by the said Garden City National Bank to the credit of S. C. Niquette, a son of the

plaintiff and a member of the firm of C. M. Niquette & Son.

"(24) C. M. Niquette had an arrangement with the Garden City National Bank to take' up the deed and pay the $4400 when it was returned to the bank and the defendants had complied with the requirements of his attorney concerning the title to the land.

"(25) The defendants did not know prior to the 25th day of August, 1905, that the plaintiff was the contemplated purchaser of said land.

"(26) The deed sent to the Garden City National Bank was returned to the defendants on September 9, 1905, together with a new deed for execution and the opinion of plaintiff's attorney concerning the title, with his requirements in relation thereto, and no other communication was had between the plaintiff and defendants until about November 10, 1905.

"(27) Granville Murray, jr., as executor of the estate of Granville Murray, sr., never applied to the probate court of Finney county, Kansas, to be appointed executor of the estate of Granville Murray, and never was so appointed by the probate court of Finney county, Kansas.

"The court therefore makes the following

"CONCLUSIONS OF LAW:

"(1) The written memoranda set up in the pleadings and as proved by the evidence, followed by the execution of the deed to the property in controversy by the defendants, is sufficient to take the contract out of the statute of frauds.

"(2) G. V. Murray, as executor of the estate of Granville Murray, deceased, had full power and authority to sell the interest of the estate in the land in controversy and to execute a deed of conveyance therefor and to give good title thereto.

"(3) No tender was necessary under the facts in this case before the commencement of the action.

"(4) The plaintiff is entitled to a specific performance of the contract, and the deed executed by the defendants, now in court, is ordered delivered to the plaintiff upon the payment of the $4400 tendered upon the trial to the defendants in this action or to the clerk of this court for said defendants; and it is ordered that such further decrees be entered as to fully protect the interest of all parties and to completely pass the title

of the land in controversy from the defendants to the plaintiff."

Judgment was rendered pursuant to the conclusions of law, and the defendants appeal.

The defendants claim the first two findings of fact are unsupported by sufficient competent evidence. Green conducted the negotiations, and beyond peradventure the letters and telegrams which passed between the plaintiff and him formed a contract which bound him. G. V. Murray, executor, authorized Green to make the sale by a telegram which satisfied the statute of frauds as to him. This telegram was a document which should have been in the possession of the defendants. Notice was served on them to produce it, which they failed to do. Any record of the message the telegraph company may have preserved was situated in a foreign state. Therefore its contents were properly proved by parol. J. A. Murray merely telephoned to Green authority to make the sale, and he alone of the vendors might have avoided the contract under the statute of frauds. He, however, ratified Green's act in the manner pointed out by the court, as G. V. Murray did, were ratification necessary to bind him. J. A. Murray instructed Green to make the contract. G. V. Murray duly authorized it. Green did make it. What Green did was ratified by both the Murrays, and the court's findings are literally true.

The defendants claim, however, that in executing the deed to the land and in depositing it in the bank at Garden City they acted without knowledge of material facts. They say the plaintiff acted in a confidential relation toward them, misrepresented the value of the land, and pretended the sale was to a sheep rancher when in fact he was the purchaser. There is no allegation in the answer of agency or other fiduciary relation or of any confidential service rendered or accepted. Manifestly the defendants can not defeat the contract on account of conduct exhibited in a relation or capacity

37—81 KAN.

which was not recognized or relied upon. Beyond this, however, the court found specifically that the plaintiff did not become agent for the defendants and that he made no representations which affected or induced the sale. What does the evidence show? The defendants claim to rely on information derived from the plaintiff's letters. The first one merely asked for a price and stated a belief that the land could be sold if the price were not too high. The second stated the plaintiff's firm had an offer of $750 per quarter net to the defendants and asked for a response. The third said eastern papers were misleading, that buyers came and looked at land and if the price was above $5 per acre went on to Colorado, where they have water as well as ditches, that the proposition made was a very good one, that the party wanting the land was a sheep rancher north of the section, and asked for lowest figures if the proposition were not accepted. This letter was dated July 26. Nothing came of it or of its predecessors. On August 18 the plaintiff wrote the following letter:

"In reply to yours of the 9th, will say, that I think we can handle your section (11-23-34 Finney Co., Kan.) at $4000. But we have no buyer at that price to-day. If you will accept that price, let me hear by return mail and we will see our clients that are interested, and give you a reply in a very short time. We just bought a quarter joining it at $800, and another one further south at $900, and still another further south, immediately on the ditch, at $1000. Will be pleased to hear from you, and if possible would like to do some business with you."

To this letter Green responded, on August 23, with an open offer to sell the land and furnish clear title and abstract up to date for $4500 net to the defendants— $3000 cash and the balance on time. On August 25 the plaintiff submitted an offer for the land by telegram in his own name, as follows: "Will take section, forty-four hundred dollars, net cash to you. Wire." This offer was accepted by wire on August 26, with a

request that the plaintiff send a deed. The plaintiff prepared a deed to himself and forwarded it for execution. In the letter transmitting the deed he said: "Have the bank give me fifteen days to get the title examined and put up the money, as I may happen to be away a few days." This deed was duly signed by all the defendants and returned to the bank at Garden City for delivery to the plaintiff. The letter of instructions to the bank reads as follows:

"Please deliver same to Mr. C. M. Niquette on payment of forty-four hundred dollars, giving him until the 15th of September to examine title, etc.

"Any charges for collection are to be paid by Mr. Niquette, as his offer was $4400 net to us."

From these facts it is plain the efforts of the plaintiff to get this land on his list as a real-estate agent failed and no fiduciary relation between the parties existed. The defendants never accepted him as their agent and did not rely upon anything he did as being confidential or as being done for their benefit.

Although a vendee has not acted in a confidential relation to the vendor equity will not decree specific performance of the contract if the vendee procured it by trick or artifice or fraud or by any unconscionable means. What are the facts in this case? The sheep rancher really went out of the negotiations with the futile attempt to obtain a pricing at $4000. The plaintiff distinctly stated he had no buyer at those figures and just as distinctly informed the defendants he was buying land in the same neighborhood for himself. When the defendants subsequently concluded to sell they made an independent offer open to everybody, which was not accepted by anybody. The plaintiff then gave up his efforts to secure an agency and rightfully proceeded to deal on his own account. The telegraphic offer of August 25 was his own personal offer, and it was duly accepted. When the defendants read and signed the deed to C. M. Niquette and sent it to Garden City to be de-

livered to him they knew perfectly well they were not conveying to any sheep rancher, and it is perfectly evident they had no concern about who obtained the land so long as they received the price agreed upon. The statement in the letter of July 26 relating to the conduct of nonresident buyers was not disproved. The statement in the same letter to the effect that the offer of $750 per quarter was a very good one was an expression of judgment and opinion by a person under no responsibility to the defendants, either then or thereafter. It accords very well with the statements in the letter of August 18 about sales of other land in the same vicinity, and they were proved to be true. Witnesses for the defendants testified that nothing was definitely settled concerning the establishment of the sugar factory at Garden City (which occasioned the great advance in the value of land there) until later, in the fall of 1905, that the land market had never been steady for any particular piece of land, and that it was difficult to say what a particular piece of land was worth in a certain month or two months. Green pleaded specifically that from information received from the plaintiff he believed the land to be worth not to exceed $4400 and relied upon that fact. The court found specifically upon conflicting evidence that the contract price of the land ($4400) was its market value at the time the contract was concluded. Therefore the charges of deception and fraud are not sustained, and the findings of the court against them are sustained and are conclusive.

It is contended the minds of the parties did not meet. The argument is supported, however, by appealing to conduct occurring subsequent to the time the contract was made. The telegrams of August 25 and 26, interpreted by the preceding letters and by the deed, constitute the written contract. It was this contract which bound Green from the beginning and which bound the Murrays after ratification. It has never been modified

or superseded, and the subsequent arrangements relating to the time and manner of carrying it out all ripened to the point where the defendants are concluded by them. The plaintiff requested a few days' time in which to inspect the abstract before paying the price. The law gave him such time without his asking for it. The Murrays say they allowed him fifteen days after lodgment of the deed in the Garden City bank. On September 6 they caused the deed to be forwarded for delivery under this condition, and it reached the bank on September 9. Green, however, in the letter of instructions stated the limit of time as September 15, doubtless because he had forwarded the abstract on August 29. The plaintiff deposited the purchase price of the land in the bank the day the deed arrived in Garden City, and thereby met all requirements. Nothing remained to be done except for the defendants to make title. Furthermore, on September 8 the plaintiff's attorney suggested certain steps to be taken to this end. Following these suggestions G. V. Murray, on September 15, made an affidavit in support of title, and on September 27 Green forwarded a copy of the will for record in Finney county, together with a letter stating that as soon as the will was recorded he would forward the affidavit and a new deed for the land. Consequently there were no terms which were left unclosed.

No formal tender to the defendants before the action was begun was made, and they cite the cases establishing the law that tender by a plaintiff in an action for specific performance must be pleaded and proved. The decisions are just as numerous and just as familiar that tender may be excused. Tender serves two purposes. It puts the defendant in default, and as an offer to do equity it gives the plaintiff a standing to invoke equitable relief. If the defendant puts himself in an attitude of default tender to him is unnecessary. It

could serve no purpose so far as he is concerned and would be a mere formality. Equity does not insist on purposeless conduct and disregards mere formalities. Consequently all that is required in such cases is that the plaintiff shall place himself in favor with the court, and this may be done by a proper offer in the pleadings. What happened here? The plaintiff deposited the money in the bank designated to receive it, to be paid over when title was completed. It was the duty of the defendants to make title. To do this it was necessary to file in the probate court of Finney county a duly authenticated copy of the will of Granville Murray, deceased. Such a copy has never been furnished or filed. The bank acknowledged to the defendants that it held the money for them awaiting completion of title, and the money has in fact been ready for them every moment of the time since the deposit was made. After some two months' delay the defendants notified the plaintiff they would not convey at all. Tender to them then had no office to perform. It is said the deed deposited in the bank was not taken up and was returned. The plaintiff was under no obligation to accept the deed until a foundation for it had been established by recording a properly authenticated copy of the will. The deed was returned for the single purpose that another might be executed bearing date subsequent to the record of the will. This was a purely formal step in what was conceived to be the proper consummation of the contract. Doubtless it was unnecessary, because the deed, whatever its date, would not take effect until delivery, but whether necessary or not the defendants acquiesced and at no time have entered the slightest complaint that they were asked to execute a second deed. Their refusal to perform was based on other grounds. To emphasize the refusal they kept the old deed and declined to make a new one. In their pleading and testimony they repudiated altogether the no-

tion that a contract to convey ever existed. What standing the defendants have in a court of conscience to defeat a conveyance because of a lack of tender is not apparent. The petition satisfied all the requirements of a good pleading.

An argument made by the defendants respecting mutuality of obligation and remedy is sufficiently answered by the decision in *Zelleken v. Lynch,* 80 Kan. 746, 748.

Whether the fifth clause of the will created a power in the executor to sell and convey the land in controversy is a question of interpretation, to be decided from the language of the instrument, and the conclusion of the trial court is clearly correct. The defendants say, however, there is no will to be examined for power to convey until the document to be perused has been filed for record in the probate court of the proper county. The defendants pleaded the will for the purpose of obtaining an interpretation of it. They claimed it created no power to sell and convey, and asked the court to make an adjudication to that effect and thereby relieve them from the obligation of a contract depending upon such power. This being true, they are not in a position to dispute the authenticity of the document they presented for scrutiny or to dispute the regularity of the court's conduct in proceeding at their behest to decide the question which they raised. Besides this, section 2953 of the General Statutes of 1901, enabling foreign executors to exercise testamentary power to sell and convey land in this state, requires no more than that the will shall be of record at the time of conveyance. Before conveyance the court may obtain knowledge of the contents of the will from any legitimate source, and there is none better than the solemn admission and declaration of the party to be bound deliberately entered upon the record.

It is said the statute providing that no will shall be effectual to pass title to real estate or personal prop-

erty unless it has been probated or recorded according
to the statute of wills (Gen. Stat. 1901, § 7966) is con-
trolling.   That statute refers to wills generally which
themselves pass title to devisees and legatees.   The will
in question does not belong to that class.   It creates a
power to pass title to a vendee by deed, and is governed,
by the act of 1879 (Laws 1879, ch. 102; Gen. Stat. 1901,
§ 2953) entitled, "An act to authorize foreign execu-
tors, and administrators with the will annexed, to con-
vey real estate, in pursuance of power contained in the
will."   It is further argued that no executor can pass
title to land in this state except by the authority and
under the direction of the probate court of the proper
county.   The argument is fully met by the statute just
referred to and by the decision of this court in *Calloway
v. Cooley,* 50 Kan. 743, sustaining that statute.

Finally it is said that because this land has greatly
increased in value and some of the beneficiaries of the
will are minors the contract ought not to be specifically
enforced.   It is true that sometimes collateral circum-
stances arising after the formation of a contract may
bring new factors into the relations of the parties so
that hardship would follow its enforcement, and in such
cases equity may decline to compel performance by one
not himself at fault.   But the rise or fall of fluctuating
markets works no hardship in an equitable sense.   The
fate of fair and just contracts freely made by com-
petent parties can not in conscience be left to depend
upon such fortuities.   (See note to *Banaghan v. Ma-
laney,* 200 Mass. 46, in 128 Am. St. Rep. 378, 413.)
And certainly a vendor who wrongfully delays fulfilling
his just obligation until the market turns and the land
rises in value has no standing in equity to deprive the
vendee of the fruits of the bargain.   To allow him to do
so would be to approve misconduct as a source of gain,
and equity can not thus be turned into an instrument of
fraud, even for the sake of minors who may be remotely
interested.

The foregoing covers the principal points argued by the defendants. Other matters of minor importance have been considered, but need not be discussed at length. The court approves the judgment of the district court, which is therefore affirmed.